# IN THE UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KAREN KING )
)
)
Plaintiff, ) Case No.
)
vs )
)
CCH, INCORPORATED )
)
Defendant )

**DOCKETED**
**JAN 2 2 2002**

**02C  0489**
**JUDGE BUCKLO**
**MAGISTRATE JUDGE DENLOW**

## COMPLAINT

## JURY TRIAL DEMANDED

The Plaintiff KAREN KING, by and through her ATTORNEYS HARRIS,

MITCHELL & DINIZULU, LLC, for his complaint states as follows:

## NATURE OF THE CASE JURISDICTION

1.  This is a civil action under 42 U.S.C. §2000e et seq., 42 U.S.C. § 1981, 42

U.S.C. 12101 et seq. and 28 U.S.C. § 1343 charging the Defendant with denial

of equal protection of the law, deprivation of liberty and property interests and

discrimination against Plaintiff in terms and conditions of employment based

on race, disability, perception of a disability and her record of a disability.

2.   The Plaintiff has complied with the administrative prerequisites by filing a

timely charge of discrimination with the EEOC. (See Attached Plaintiff's

Exhibit A)

3.  On or about October 27, 2001, Plaintiff received her Notice of Right to Sue

from EEOC. (See Attached Plaintiff's Exhibit B)



4.     Plaintiff seeks compensatory damages for lost wages, including lost overtime

and differential pay, lost career opportunities and such other affirmative relief

as necessary to compensate the Plaintiff for the discriminatory actions of the

Defendants, which deprived Plaintiff of his right to equal terms and conditions

of employment and to a neutral work environment free of race and disability

discrimination and deprived the plaintiff of liberty and property without due

process of the law. Jurisdiction is conferred on the Court 42 U.S.C. §2000e et

seq., 42 U.S.C. § 1981, 42 U.S.C. 12101 et seq. and 28 U.S.C. § 1343 .

## COMMON ALLEGATIONS

5.     The Plaintiff Karen King is an African-American female and a resident of

Cook County Illinois.

6.     Defendant CCH is an Illinois Corporation and is subject to the jurisdiction of

this Court.  Defendant is an employer with in the meaning of 42 U.S.C §

2000e.

7.     Plaintiff worked for CCH for four years.  She was originally hired as a

temporary worker in September 1996 and performed so well for the company

that she was brought on permanently as a Senior Technical Analyst in October

1997.  The Plaintiff reported to Jill Sullivan ("Sullivan"), a Team Leader with

the company, who, in turn, reported to Jan Kirkpatrick, Director of Financial

Service.

8.     On February 28, 2000, while at work, the plaintiff was walking down the

stairs when she slipped, causing her to fall forward violently.  The fall caused

significant pain and injury to her.  At first, the injury caused a small limp in

her walk. Although she immediately returned to work, the limp worsened and her back began to hurt.

9.     Although the plaintiff continued working and had seen her doctor in early March 2000, the discomfort continued to grow and, on March 10, she visited the emergency room due to the severity of the pain. X-rays were taken of the plaintiff's spine and she was told to stay home for the next two weeks and to get physical therapy. However, because of her dedication to the company, she chose to telecommute for the next two weeks instead of taking time off as the doctor suggested.

10.     On March 27, hoping to get a release back to work, she saw her orthopedic surgeon. He told her that she could not return to work and, in fact, had to stay home indefinitely. This doctor diagnosed her as having severe cervical spondylosis, a form of chronic arthritis resulting from the spine being out of alignment, which had been aggravated and significantly worsened by the fall. That same day, she informed Sullivan of her doctor's orders, but agreed to telecommute. This arrangement still required her to be at the office for several meetings during this period, and Sullivan also required the plaintiff to produce a detailed schedule of the work she was doing. The plaintiff followed orders and successfully fulfilled her job duties throughout the month. She regularly worked 15 hours or more per day and kept Sullivan apprised of her work. The plaintiff had since learned that Tracey Cawthorn ("Cawthorn"), a Caucasian CCH employee working under Sullivan, was not required to submit any sort of detailed schedule while she telecommuted.

3

11.    On April 15, 2000, Sullivan approached the plaintiff and told the plaintiff that she needed to go on short-term disability instead of telecommuting, which, according to Sullivan, would allow Sullivan to replace her on staff. The plaintiff obeyed this directive and contacted Jeff Urbaszewski ("Urbaszewski") in CCH's Human Resources Department. She informed Urabaszewski that in accordance with her supervisor's order, she was to be reassigned to short-term disability. Urabaszewski said that was fine, and that because the plaintiff was sick, she should be at home anyway, not coming into the office.

12.    The plaintiff started her leave as of May 1, 2000. Over the next month, she saw several specialists regarding her health condition, including her orthopedic surgeon and therapist.

13.    In June, Urbaszewski contacted the plaintiff and explained that although the CCH short-term disability coverage lasted for six months, if an employee was on disability for "four months" or longer, there was a possibility that the individual's job could be opened and he/she replaced.

14.    Although the plaintiff had anticipated returning to work by the end of May, she was stricken with additional health problems. She developed rheumatoid arthritis and a severe edema in her legs and feet. The Plaintiff's doctors also suspected that other symptoms indicated that the plaintiff might have a thyroid disease, a heart condition, and possibly a brain tumor. The plaintiff relayed all of this information to Sullivan and Urbaszewski.

4

15.     Toward the end of the four-month window, the plaintiff was ready to return to work. On August 18, 200, the plaintiff informed Sullivan that, with a release from her doctor, she could report to work on August 30, 2000. On August 22, Urbazewski phoned and told the plaintiff that there were short-term disability forms for her doctor to complete and return, the plaintiff told him that she could personally deliver the forms to her doctor and bring them to CCH that day, but asked if they could complete this process by mail instead. Urbaszewski agreed to do this and put the forms in the mail.

16.     The next day, August 23, the plaintiff's friend called and informed her that an e-mail her friend sent to the plaintiff's work address had been returned. Hours later, her former boss called and told her that her CCH cell phone number was not working. On August 24, Urbaszewski phoned the plaintiff again and told her that in a meeting the previous day, Sullivan had urged that the company post the plaintiff's job. The plaintiff reminded Urbaszewski that her four-month leave had not yet expired and that he assured her that her job could not be posted for four months. Urbaszewski responded by stating that the leave time was not four months, but 16 weeks, and, therefore, the leave time had expired. The next day, the plaintiff learned from co-workers that Sullivan had sent an e-mail to the department which stated that the plaintiff was still sick and that, due to workload, the plaintiff would be replaced.

17.     The plaintiff spoke with Urbaszewski again that same day. He told the plaintiff to return the company property in the plaintiff's possession. The plaintiff asked Urbaszewski why Sullivan had not called her about any of this.

Urbaszewski simply stated that it was not Sullivan's job. Later that day

(August 25), the plaintiff had another phone conversation with Urbaszewski.

In this conversation, Urbaszewski stated that out of all the employees he had

dealt with on short-term disability, no one had as many problems and doctors

as the plaintiff did, and that she was a nightmare to deal with administratively.

18. On August 29, 2000, Urbaszewski phoned and told the plaintiff that he had

received her doctor's release and that the plaintiff should report to work the

next day. The plaintiff reminded Urbaszewski that in accordance with CCH's

directives, she no longer worked for the company. Urbaszewski replied,

"You do if you wanna get paid." Urbazewski then explained that this was

because they had overpaid her $12,000 and "they had to get it back."

Urbaszewski did not explain why the plaintiff had been overpaid or why she

had not been informed of this alleged error.

19. The plaintiff reported for work on August 30. From this point forward,

Sullivan's attitude towards the plaintiff was very hostile. For instance, on her

very first day back, the plaintiff was directed by Sullivan not to work on

anything, but to clean up her cube – nothing more. Sullivan told her that she

was "not to use the internet," "not to talk on her phone," and not to answer

questions."

20. In a meeting on or about September 18, 2000, barely two weeks after the

plaintiff's return, Sullivan issued a Performance Improvement Plan ("PIP") to

her. In addition, the plaintiff had always worked from 7:00 a.m. to 4:00 p.m.,

the plaintiff was informed that she would now work an 8:00 a.m. to 5:00 p.m.

shift because, according to Sullivan, someone needed to be in the office after 4:00 p.m. The plaintiff explained that this would be a problem because she had physical therapy and chiropractic appointments scheduled in the afternoons. Sullivan essentially ignored this, stating only that, "We'll work with it." The plaintiff later learned that this shift change was not imposed on Tracy Cawthorn (an employee without health problems, but who wanted to get home earlier because she did not have child care after school). In fact, Cawthorn was allowed to leave even earlier so that she could telecommute with greater ease. The plaintiff did stay to meet the business needs and missed her scheduled therapy. The plaintiff ended up having to cancel her physical therapy altogether because of repeated conflicts. When told of these conflicts, instead of being apologetic, Sullivan told her that she was glad that she could now work this new schedule.

21.     Sullivan's trivial criticisms of the plaintiff continued through September. For example, Sullivan denied her request for a new company cell phone, even though the plaintiff's was broken and this request was routinely granted for others. On September 29, 2000, the plaintiff was notified that in the 10 days since the PIP was instituted, she had not demonstrated significant improvement and the she had to improve by October 29, 2000 or be terminated. Although this ultimatum was presented as a test for her, the decision to terminate the plaintiff was clearly predetermined. This *fait accompli* was evidenced by Sullivan's refusal to set an appointment with her for November and was confirmed by her termination.

22.   On October 2, the plaintiff had yet another meeting with Sullivan about her "performance Problems." *To wit*, Sullivan said that the plaintiff was not been doing her job well – that she was "too slow" and made too many mistakes. The plaintiff responded to this unfounded criticism by asking Sullivan why she even brought her back if this was the way she was going to treat her. Sullivan had no response.

23.   On the morning of October 25, while taking personal time off ("PTO"), the plaintiff left a voice mail message for Cawthorn that she would (as a favor) handle a meeting at the company with a technician. Later that morning, the plaintiff received a message form Sullivan stating, "Please do not leave Tracy a gazillion messages. She was on PTO." Two days later, on October 27, Sullivan made even further preparations for the plaintiff's termination, telling her by voice mail and e-mail (while she was still on PTO) that she was not to work on databases any more and that she was to forward all e-mails and voice mails about these projects to Cawthorn. Sullivan then told the plaintiff that she should instead begin working on CBTs (computerized business training) while she rearranged projects.

24.   On November 2, 2000, the plaintiff attended a staff meeting with Kirkpatrick and Sullivan. At the meeting, Sullivan did not give her any new projects and assigned new matters to a temporary employee, Ron Pratscher, Finally, on November 6, 2000, the plaintiff was called into a meeting with Doris Snipes of Human Resources, Kirkpatrick and Sullivan. At this meeting, Sullivan told

the plaintiff that she was terminated. Snipes added that she would be paid for two weeks, although the plaintiff's medical benefits would end as of midnight.

25. As a result to the alleged "overpayments" to the plaintiff, she was not paid from July 31 to October 20. The plaintiff was never shown any documentation for this alleged clerical error.

26. The plaintiff was one of only four African-American employees in the technical area. All of her supervisors were white, as is Cawthorn, who CCH was happy to accommodate. Furthermore, the technical area is far from " color-blind,"; The plaintiff heard bigoted comments within the technical area (e.g., how happy they were that they didn't have to work near a younger African-American man who works in the Data Center; on their floor, "thank goodness, we only have two," referring to her and another African-American woman).

## RACE AND DISABILITY DISCRIMINATION

27. The plaintiff believe that she has been discriminated against because of her race and disability, CCH's perception of a disability, and her record of a disability, because:

    a. She is an African-American and suffers from severe cervical spondylosis, which the company knew about.

    b. She performed her job satisfactorily.

    c. She was denied a leave of absence and the opportunity to telecommute.

    d. A non-disabled Caucasian employee was allowed to telecommute and take a leave of absence.

9

28.  The plaintiff believe that her job utilities were cut off because of her race and disability, CCH's perception of a disability, and her record of a disability because:

a.  The plaintiff is an African-American and suffers from severe cervical spondylosis, which the company knew about.

b.  The plaintiff performed her job satisfactorily.

c.  While the plaintiff was out on leave for her disability, her job utilities were taken away from her.

d.  Non-disabled Caucasian employees were not treated in this way.

29.  The plaintiff believes that she was terminated because of her race and disability, CCH's perception of a disability, and her record of a disability because:

a.  The plaintiff is an African-American and suffers from severe cervical spondylosis, which the company knew about.

b.  The plaintiff performed her job satisfactorily.

c.  The plaintiff was terminated.

d.  Non-disabled and Caucasian employees were not treated in this way.

30.  The plaintiff has not been paid for her work from July 31, 200, to October 20, 2000 because of her race and disability, CCH's perception of a disability, and her record of a disability because:

a. The plaintiff is an African-American and suffers from severe cervical spondylosis, which the company knew about.

b. The plaintiff performed my job satisfactorily.

c. The plaintiff was denied a leave of absence and the opportunity to telecommute.

d. Non-disabled and Caucasian employees were not treated in this way.

31. WHEREFORE, the plaintiff respectfully prays that this court:

a) Declare and adjudge the conduct of the Defendants to be violative of the Plaintiff's right to a neutral work environment and to constitute discrimination under 42 U.S.C. § 2000 e et seq., 42 U.S.C. § 1981 and 42 U.S.C. § 12101.

b) Award Plaintiff compensatory damages;

c) Award Plaintiff reasonable costs and attorney's fees;

d) Grant such other and further relief as may be proper.

ATTORNEYS FOR PLAINTIFF

Dated: January 22, 2002

Respectfully Submitted,

By: Stephen S. Mitchell

Harris, Mitchell & Dinizulu, LLC
205 W. Randolph St., Ste. 410
Chicago, IL 60606
312/ 236-2900
Atty. No. 37608

11

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ FEPA | |
| ☒ EEOC | 21CA11808 |

**Illinois Dept. of Human Rights** _____ and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Karen King | 773/761-5857 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1213 West Farwell, 1st Floor | Chicago, IL 60626 | 11/18/56 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| CCH Incorporated | 15+ | 847/267-7000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 2700 Lake Cook Road | Riverwoods, IL 60015 | Lake |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE    ☒ COLOR    ☐ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN
☐ RETALIATION    ☐ AGE    ☒ DISABILITY    ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE |
|---|
| EARLIEST (ADEA/EPA)    LATEST (ALL) |
| 4/15/2000 |
| ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

A. ISSUE/BASIS

1. DENIED LEAVE OF ABSENCE AND TELECOMMUTING BY MY EMPLOYER, CCH, ON APRIL 15, 2000, BECAUSE OF MY DISABILITY (SEVERE CERVICAL SPONDYLOSIS), PERCEIVED DISABILITY, AND RECORD OF A DISABILITY, AND BECAUSE OF MY RACE (AFRICAN-AMERICAN).

2. LEARNED THAT CCH HAD TAKEN AWAY MY JOB UTILITIES ON AUGUST 23, 2000, BECAUSE OF MY DISABILITY (SEVERE CERVICAL SPONDYLOSIS), PERCEIVED DISABILITY, AND RECORD OF A DISABILITY, AND BECAUSE OF MY RACE (AFRICAN-AMERICAN).

3. TERMINATED ON NOVEMBER 6, 2000, BECAUSE OF MY DISABILITY (SEVERE CERVICAL SPONDYLOSIS), PERCEIVED DISABILITY AND RECORD OF A DISABILITY, AND BECAUSE OF MY RACE (AFRICAN-AMERICAN).

RECEIVED EEOC

9 2001

CHARGE DISTRIB

PLAINTIFF'S
EXHIBIT
A
Blumberg No. 6119

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

NOTARY (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 02/04/04

| SIGNATURE OF COMPLAINANT | DATE |
|---|---|
| | 2/9/2001 |

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE

Page 2 —   4.   I HAVE NOT BEEN PAID FOR MY WORK FROM JULY 31, 2000, TO OCTOBER 20, 2000, BECAUSE OF MY DISABILITY (SEVERE CERVICAL SPONDYLOSIS), PERCEIVED DISABILITY, AND RECORD OF A DISABILITY, AND BECAUSE OF MY RACE (AFRICAN-AMERICAN).

B.   PRIMA FACIE ALLEGATIONS

1.   I am African-American.

2.   I worked for CCH for four years. I was originally hired as a temporary worker in September 1996 and performed so well for the company that I was brought on permanently as a Senior Technical Analyst in October 1997. I reported to Jill Sullivan ("Sullivan"), a Team Leader with the company, who, in turn, reported to Jan Kirkpatrick, Director of Financial Services.

3.   On February 28, 2000, while at work, I was walking down the stairs when I slipped, causing me to fall forward violently. The fall caused significant pain and injury to me. At first, the injury caused a small limp in my walk. Although I immediately returned to work, the limp worsened and my back began to hurt.

4.   Although I continued working and had seen my doctor in early March 2000, the discomfort continued to grow and, on March 10, I visited the emergency room due to the severity of the pain. X-rays were taken of my spine and I was told to stay home for the next two weeks and to get physical therapy. However, because of my dedication to the company, I chose to telecommute for the next two weeks instead of taking time off as the doctor suggested.

---

I declare under penalty of perjury that the foregoing is true and correct.

_____          2-9-01
Charging Party (Signature)                      Date

Subscribed and sworn to before me this 9th day of February, 2001.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 03/06/04

Page 3 -

5.  On March 27, hoping to get a release back to work, I saw my orthopedic surgeon. He told me that I could not return to work and, in fact, had to stay home indefinitely. This doctor diagnosed me as having severe cervical spondylosis, a form of chronic arthritis resulting from the spine being out of alignment, which had been aggravated and significantly worsened by the fall. That same day, I informed Sullivan of my doctor's orders, but agreed to telecommute. This arrangement still required me to be at the office for several meetings during this period, and Sullivan also required that I produce a detailed schedule of the work I was doing. I followed orders and successfully fulfilled my job duties throughout the month. I regularly worked 15 hours or more per day and kept Sullivan apprised of my work. I have since learned that Tracey Cawthorn ("Cawthorn"), a Caucasian CCH employee working under Sullivan, was not required to submit any sort of detailed schedule while she telecommuted.

6.  On April 15, 2000, Sullivan approached me and told me that I needed to go on short-term disability instead of telecommuting, which, according to Sullivan, would allow her to replace me on staff. I obeyed this directive and contacted Jeff Urbaszewski ("Urbaszewski") in CCH's Human Resources Department. I informed Urbaszewski that in accordance with my supervisor's order, I was to be reassigned to short-term disability. Urbaszewski said that was fine, and that because I was sick, I should be at home anyway, not coming into the office.

7.  I started my leave as of May 1, 2000. Over the next month, I saw several specialists regarding my health condition, including my orthopedic surgeon and therapist.

---

I declare under penalty of perjury that the foregoing is true and correct.

_____                    2-9-01
Charging Party (Signature)                          Date

Subscribed and sworn to before me this 9th day of February, 2001.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/04/04

Page 4 –

8.  In June, Urbaszewski contacted me and explained that although the CCH short-term disability coverage lasted for six months, if an employee was on disability for "four months" or longer, there was a possibility that the individual's job could be opened and he/she replaced.

9.  Although I had anticipated returning to work by the end of May, I was stricken with additional health problems. I developed rheumatoid arthritis and a severe edema in my legs and feet. My doctors also suspected that other symptoms indicated that I might have a thyroid disease, a heart condition, and possibly a brain tumor. I relayed all of this information to Sullivan and Urbaszewski.

10.  Toward the end of the four-month window, I was ready to return to work. On August 18, 2000, I informed Sullivan that, with a release from my doctor, I could report to work on August 30, 2000. On August 22, Urbaszewski phoned and told me that there were short-term disability forms for my doctor to complete and return. I told him that I could personally deliver the forms to my doctor and bring them to CCH that day, but asked if they could complete this process by mail instead. Urbaszewski agreed to do this and put the forms in the mail.

11.  The next day, August 23, a friend of mine called and informed me that an e-mail I sent to my work address had been returned. Hours later, my former boss called and told me that my CCH cell phone number was not working. On August 24, Urbaszewski phoned me again and told me that in a meeting the previous day, Sullivan had urged that the company post my job. I reminded Urbaszewski that my four-month leave had not yet expired and that he assured me my job could not be posted for four months.

---

I declare under penalty of perjury that the foregoing is true and correct.

_____          2-9-01
Charging Party (Signature)          Date

Subscribed and sworn to before me this 9th day of February, 2001.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/04/04

Page 5 –   Urbaszewski responded by stating that the leave time was not four months, but 16 weeks, and, therefore, the leave time had expired. The next day, I learned from co-workers that Sullivan had sent an e-mail to the department which stated that I was still sick and that, due to workload, I would be replaced.

12.   I spoke with Urbaszewski again that same day. He told me to return the company property in my possession. I asked Urbaszewski why Sullivan had not called me about any of this. Urbaszewski simply stated that it was not Sullivan's job.   Later that day (August 25), I had another phone conversation with Urbaszewski. In this conversation, Urbaszewski stated that out of all the employees he had dealt with on short-term disability, no one had as many problems and doctors as I did, and that I was a nightmare to deal with administratively.

13.   On August 29, 2000, Urbaszewski phoned and told me that he had received my doctor's release and that I should report to work the next day. I reminded Urbaszewski that in accordance with CCH's directives, I no longer worked for the company. Urbaszewski replied, "You do if you wanna get paid." I then explained that, in fact, I had not been paid since July 31. Urbaszewski stated that this was because they had overpaid me $12,000 and "they had to get it back." Urbaszewski did not explain when I had been overpaid or why I had not been informed of this alleged error.

14.   I reported for work on August 30. From this point forward, Sullivan's attitude toward me was very hostile. For instance, on my very first day back, I was directed by Sullivan not to work on anything, but to clean up

I declare under penalty of perjury that the foregoing is true and correct.

_____          _____
Charging Party (Signature)                          2-9-01
                                                                 Date

Subscribed and sworn to before me this 9th day of February, 2001.

_____
Notary Public



"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/06/04

Page 6  -

my cube - nothing more.  Sullivan told me that I was "not to use the internet," "not to talk on her phone," and "not to answer questions."

15.    In a meeting on or about September 18, 2000, barely two weeks after my return, Sullivan issued a Performance Improvement Plan ("PIP") to me.  In addition, although I had always worked from 7:00 a.m. to 4:00 p.m., I was informed that I would now work an 8:00 a.m. to 5:00 p.m. shift because, accordingly to Sullivan, someone needed to be in the office after 4:00 p.m. I explained that this would be a problem because I had physical therapy and chiropractic appointments scheduled in the afternoons.  Sullivan essentially ignored this, stating only that, "We'll work with it."  I later learned that this shift change was not imposed on Tracy Cawthorn (an employee without health problems, but who wanted to get home earlier because she did not have child care after school).  In fact, Cawthorn was allowed to leave even earlier so that she could telecommute with greater ease. I did stay to meet the business needs and missed my scheduled therapy.  I ended up having to cancel my physical therapy altogether because of repeated conflicts.  When told of these conflicts, instead of being apologetic, Sullivan told me that she was glad I could now work this new schedule.

16.    Sullivan's trivial criticisms of me continued through September. For example, Sullivan denied my request for a new company cell phone, even though mine was broken and this request was routinely granted for others. On September 29, 2000, I was notified that in the 10 days since the PIP was instituted, I had not demonstrated significant improvement and that I had to improve by October 29, 2000 or be terminated. Although this ultimatum was presented as a test for me, the decision to terminate me was clearly

I declare under penalty of perjury that the foregoing is true and correct.

_____          _____
Charging Party (Signature)                      2-9-01
                                                          Date

Subscribed and sworn to before me this 9th day of February, 200/.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/06/04

Page 7 –

predetermined. This *fait accompli* was evidenced by Sullivan's refusal to set an appointment with me for November and was confirmed by my termination.

17. On October 2, I had yet another meeting with Sullivan about my "performance problems." To wit, Sullivan said that I was not doing my job well – that I was "too slow" and made too many mistakes. I responded to this unfounded criticism by asking Sullivan why she even brought me back if this was the way she was going to treat me. Sullivan had no response.

18. On the morning of October 25, while taking personal time off ("PTO"), I left a voice mail message for Cawthorn that I would (as a favor) handle a meeting at the company with a technician. Later that morning, I received a message from Sullivan stating, "*Please do not leave Tracy a gazillion messages. You are on PTO.*" Two days later, on October 27, Sullivan made even further preparations for my termination, telling me by voice mail and e-mail (while I was still on PTO) that I was not to work on databases any more and that I was to forward all e-mails and voice mails about these projects to Cawthorn. Sullivan then told me that I should instead begin working on CBTs (computerized business training) while she rearranged projects.

19. On November 2, 2000, I attended a staff meeting with Kirkpatrick and Sullivan. At the meeting, Sullivan did not give me any new projects and assigned new matters to a temporary employee, Ron Pratscher. Finally, on November 6, 2000, I was called into a meeting with Doris Snipes of Human Resources, Kirkpatrick and Sullivan. At this meeting, Sullivan told me that

I declare under penalty of perjury that the foregoing is true and correct.

_____     _____2-9-01_____
Charging Party (Signature)                            Date

Subscribed and sworn to before me this 9th day of February, 2001.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/04/04

Page 8 - I was terminated. Snipes added that I would be paid for two weeks, although my medical benefits would end as of midnight.

20. As a result of the alleged "overpayments" to me, I was not paid from July 31 to October 20. I was never shown any documentation for this alleged clerical error.

21. I was one of only four African-American employees in the technical area. All of my supervisors were white, as is Cawthorn, who CCH was happy to accommodate. Furthermore, the technical area is far from "color-blind,"; I heard bigoted comments within the technical area (e.g., how happy they were that they didn't have to work near a younger African-American man who works in the Data Center; that, on their floor, "thank goodness, we only have two," referring to me and another African-American woman).

22. I believe that I have been discriminated against because of my race and disability, CCH's perception of a disability, and my record of a disability because:

a) I am African-American and suffer from severe cervical spondylosis, which the company knew about.

b) I performed my job satisfactorily.

c) I was denied a leave of absence and the opportunity to telecommute.

d) A non-disabled Caucasian employee was allowed to telecommute and take a leave of absence.

---

I declare under penalty of perjury that the foregoing is true and correct.

_____          _____2-9-01_____
Charging Party (Signature)                        Date

Subscribed and sworn to before me this 9th day of February, 200/.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/04/m.

Page 9 –  23.  I believe that my job utilities were cut off because of my race and disability, CCH's perception of a disability, and my record of a disability because:

    a)    I am African-American and suffer from severe cervical spondylosis, which the company knew about.

    b)    I performed my job satisfactorily.

    c)    While I was out on leave for my disability, my job utilities were taken away from me.

    d)    Non-disabled and Caucasian employees were not treated in this way.

24.  I believe that I was terminated because of my race and disability, CCH's perception of a disability, and my record of a disability because:

    a)    I am African-American and suffer from severe cervical spondylosis, which the company knew about.

    b)    I performed my job satisfactorily.

    c)    I was terminated.

    d)    Non-disabled and Caucasian employees were not treated in this way.

I declare under penalty of perjury that the foregoing is true and correct.

_____    _____
Charging Party (Signature)              2-9-01
                                                        Date

Subscribed and sworn to before me this 9th day of February, 2001.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON
COMMISSION EXPIRES 03/06/0_

Page 10 –    25.    I believe that I have not been paid for my work from July 31, 2000 to October 20, 2000 because of my race and disability, CCH's perception of a disability, and my record of a disability because:

a)    I am African-American and suffer from severe cervical spondylosis, which the company knew about.

b)    I performed my job satisfactorily.

c)    I worked for CCH from July 31, 2000 to October 20, 2000, but was never paid for this period.

d)    Non-disabled and Caucasian employees were not treated in this way.

I declare under penalty of perjury that the foregoing is true and correct.

_____                    _2 - 9 - 0 1_
Charging Party (Signature)                                    Date

Subscribed and sworn to before me this _9th_ day of _February_, 200_1_.

_____
Notary Public

"OFFICIAL SEAL"
JULIE C. STEVENSON



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison St., Suite 2800
Chicago, IL 60661
PH: (312) 353-2713
TDD: (312) 353-2421
ENFORCEMENT FAX: (312) 886-1168
LEGAL FAX: (312) 353-8555

October 22, 2001

Ms. Karen King
1213 West Farwell, 1ˢᵗ Floor
Chicago, Illinois 60626

Re:     Charging Party: King
        Respondent: CCH, Inc.
        EEOC Number: 210A11808

Dear Ms. King:

The enclosed Dismissal and Notice of Rights was sent to you on August 31, 2001 via certified mail. However, the Postal Service returned it to the Commission because it was unclaimed.

We are sending it again via regular mail so that you may have another opportunity to receive it.

Sincerely,

John P. Rowe (K3)

John P. Rowe
District Director

Enclosure



Equal Employment Opportunity Commission

## DISMISSAL AND NOTICE OF RIGHTS

To: CERTIFIED MAIL NO.: 7099-3400-0006-7307-6418 C/P    From:

Karen King
1213 West Farwell, 1ˢᵗ Floor
Chicago, Illinois  60626

Equal Employment Opportunity Commission
Chicago District Office
500 West Madison Street, Suite 2800
Chicago, Illinois 60661-2511

[    ]  *On behalf of a person aggrieved whose identity is*
       *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 210A11808 | Mr. Scott Sommers, Enforcement Supervisor | (312) 886-9117 |

*(See the additional information attached to this form.)*

YOUR CHARGE IS DISMISSED FOR THE FOLLOWING REASON:

[    ]  The facts you allege fail to state a claim under any of the statutes enforced by the Commission

[    ]  Respondent employs less than the required number of employees.

[    ]  Your charge was not timely filed with the Commission, *i.e.*, you waited too long after the date(s) of the discrimination you alleged to file your charge.  Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[    ]  You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your charge.  You have had more than 30 days in which to respond to our final written request.

[    ]  The Commission has made reasonable efforts to locate you and has been unable to do so.  You have had at least 30 days in which to respond to a notice sent to your last known address.

[    ]  The respondent has made a reasonable settlement offer which affords full relief for the harm you alleged.  At least 30 days have expired since you received actual notice of this settlement offer.

[ x ]  The Commission issues the following determination: Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[    ]  Other *(briefly state)*  _____

### - NOTICE OF SUIT RIGHTS -

[ x ]  **Title VII and/or the Americans with Disabilities Act:** This is your NOTICE OF RIGHT TO SUE, which terminates the Commission's processing of your charge.  If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in a court of competent jurisdiction.  **If you decide to sue, you must sue WITHIN 90 DAYS** from your receipt of this Notice; otherwise your right to sue is lost.

[    ]  **Age discrimination in Employment Act:** This is your NOTICE OF DISMISSAL OR TERMINATION, which terminates processing of your charge.  If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in a court of competent jurisdiction.  **If you decide to sue, you must sue WITHIN 90 DAYS** from your receipt of this Notice; otherwise your right to sue is lost.

[    ]  **Equal Pay Act (EPA):** EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

31 August 2001

On behalf of the Commission

John P. Rowe, District Director

Enclosures
    Information Sheet
    Copy of Charge
cc:  Respondent(s)        CCH Incorporated

Civil Cover Sheet                                                  Page 1 of 1

Cot #2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

DOCKETED
JAN 2 2 2002

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s): KAREN KING** | **Defendant(s):CCH INCORPORATED** |
| County of Residence: | County of Residence: |
| Plaintiff's Atty: STEPHEN S. MITCHELL<br>205 WEST RANDOLPH ST.,<br>STE. 410<br>CHICAGO, IL 60606<br>(312) 236-2900 | Defendant's Atty: ROBERT E. ARROYO<br>320 WEST OHIO, STE.<br>500<br>CHICAGO, IL 60610<br>(312) 787-4949 |

II. Basis of Jurisdiction:       **3. Federal Question (U.S. not a party)**

III. Citizenship of Principle
Parties (**Diversity Cases Only**)

**02C 0489**

                        Plaintiff:- **N/A**
                        Defendant:- **N/A**

JUDGE BUCKLO

IV. Origin :                **1. Original Proceeding**

MAGISTRATE JUDGE DENLOW

V. Nature of Suit:          **442 Employment**

VI. Cause of Action:        **42 U.S.C. §2000e et seq., 42 U.S.C. Section 1981, 42 U.S.C. 12101
                            et seq. and 28 U.S.C. Section 1343**

VII. Requested in Complaint
        Class Action: **No**
        Dollar Demand:
        Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____1/18/02_____

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### Eastern Division

**DOCKETED**

JAN 2 2 2002

In the Matter of

KAREN KING

v.

CCH, INCORPORATED

Case Number:

**02C 0489**

**JUDGE BUCKLO**

**MAGISTRATE JUDGE DENLOW**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

PLAINTIFF

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME STEPHEN S. MITCHELL | NAME |
| FIRM HARRIS, MITCHELL & DINIZULU, LLC | FIRM |
| STREET ADDRESS 205 WEST RANDOLPH ST. STE. 410 | STREET ADDRESS |
| CITY/STATE/ZIP CHICAGO, ILLINOIS 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 236-2900 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6271346 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☑ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |